UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:10-cr-14-3 |
| | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| | : | |
| BERNARD J. KURLEMANN, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER THAT DEFENDANT KURLEMANN'S MOTION TO DISMISS THE FALSE STATEMENT CHARGES (Doc. 29) BE DENIED

This criminal case is before the Court on Defendant Kurlemann's motion to dismiss the false statement charges (Counts 5, 6, 7) (Doc. 29) and the government's responsive memorandum (Doc. 40).

## I.  SUMMARY OF FACTS AS ALLEGED BY THE UNITED STATES

Defendant Kurlemann was an experienced home builder who specialized in constructing and selling high-end, luxury homes in the greater Cincinnati area. Kurlemann owned and operated several companies, including but not limited to Kurlemann Builders, Inc. ("KBI"), Kurlemann Homes of Long Cove, and Long Cove Management, LLC.  Beginning from at least in or about 2006, Defendant faced increased financial pressure.  In 2006, his companies were carrying a total short-term loan debt of approximately $20,426,667.00; in 2007, approximately $26,925,153.00.  During this same time period, Kurlemann was defending his company, KBI, in an aggressively litigated

lawsuit brought by Connie and John Musuraca. Defendant's attorneys' fees from the lawsuit were approximately $536,676.00, doubling his average litigation costs. In September 2007, a jury found in favor of the Musuraca's and the court entered a $1.1 million judgment against KBI.

Defendant was also unable to sell a number of properties in a timely manner which placed an increased financial burden on Kurlemann and his various companies. Defendant and Kurlemann Homes of Long Cove owned a residential property located at 8662 Hampton Bay, Mason, Ohio. The property had been listed for about three years, from approximately December 2004 to January 2007, with no buyers until Defendant Eric Duke. Kurlemann and Long Cove Management, LLC also owned a residential property located at 8657 Emerald Isle, Mason, Ohio. This home had been listed for approximately two years.

Kurlemann hired Duke to stage his model homes. After Duke advised Kurlemann that he owned a property management company, Kurlemann conspired with Duke and two straw buyers, Francisca Webster and Christopher Gagnon, to make false statements to the lender in order for Kurlemann to unload the two properties. On both loans, Defendant falsely stated that he received a down payment from the borrower or straw purchaser, when he had not received a down payment. The loans were approved and Kurlemann walked away with almost $500,000.00 in profit made between January and July 2007 from the fraudulent sale of the two properties.

-2-

### 1. 8662 Hampton Bay Fraud

In October 2006, Kurlemann signed an initial purchase agreement to sell 8662 Hampton Bay to Francisca Webster for $2,300,000, not Duke with whom he was dealing and relying upon to obtain the loan. The purchase agreement stated that a $0 deposit had been made. About one month later, Kurlemann signed another purchase agreement to sell the property to Webster for $1,979,000. Again, the purchase agreement stated a $0 deposit had been made.

Kurlemann subsequently signed an addendum to the purchase agreement falsely stating that on December 1, 2006, he had accepted a $229,000 payment from Webster which included a $200,000 down payment as required by the lender. Kurlemann never received any down payment from Webster. This was a false statement on the purchase agreement. While the purchase agreement was submitted to the lender, the addendum was not located in the lender file. Kurlemann, however, filed an affidavit swearing that the addendum was part of the purchase agreement.

After the addendum was signed, Duke submitted fraudulent information for Webster's loan application which contained multiple false statements, including that $200,000 earnest money were "funds already down" to the seller. Because Kurlemann submitted the addendum stating that he received the down payment as of December 1, 2006, Duke also submitted that none of the earnest money was borrowed which was also false. The lender, Washington Mutual Bank ("WAMU"), allegedly considered the down

-3-

payment an important factor in approving a loan in the amount of approximately

$1,779,121. The 10% down payment was a reflection of the borrower's ability to pay.

The loan was approved on January 12, 2007. The HUD-1 settlement statement

indicated that the seller, Defendant Kurlemann, had received $200,000 earnest money or

excess deposit. This statement on the HUD-1 settlement statement was false.

After the closing, Kurlemann's associate instructed Webster to sign a promissory

note for $229,000. WAMU did not know about the promissory note even though all

financial transactions related to the sale should have been reflected on the HUD-1.

Kurlemann walked away from the closing with approximately $190,073 in loan

proceeds. Kurlemann recorded the promissory note in March.

### 2. 8657 Emerald Isle Fraud

Less than one month after the close of 8662 Hampton Bay, Kurlemann and Duke

continued their conspiracy with the fraudulent sale of the property located at 8657

Emerald Isle. Kurlemann signed an initial purchase agreement with Christopher

Gagnon,[1] not Duke, to sell the property for $2,800,000. On the purchase agreement,

Kurlemann falsely stated that he had received a $280,000 down payment from Gagnon.

Duke then submitted false information for Gagnon's $2,800,000 loan application. On

April 19, 2007, Kurlemann signed another purchase contract with Gagnon. This time,

Kurlemann stated that the $280,000 deposit would be received prior to closing.

---

[1] Neither Francisca Webster nor Christopher Gagnon ever met with Defendant Kurlemann.

-4-

Kurlemann and Duke conspired that proof of the down payment would influence the lending decision. Therefore, Kurlemann wired approximately $280,000 from one of his accounts to Duke on May 2. Duke then converted the money he received from Kurlemann into a cashier's check in the amount of $280,000, making it appear that the money was coming from Gagnon to Kurlemann. With this cashier's check, Duke returned the $280,000 back to Kurlemann. This transaction was part of the conspiracy to show Kurlemann received a down payment in order to mislead the lender.

On May 3, 2007, defendant Kurlemann signed yet another purchase agreement falsely stating that he received a $280,000 deposit from Gagnon. A copy of the cashier's check was attached as proof of payment. This was a false statement on the purchase agreement that was submitted to the lender.

Subsequently, Duke provided false information for two loan applications for Gagnon, one for $2,080,000 and one for $347,300. Because Kurlemann submitted a purchase agreement with the false statement that he had received a $280,000 down payment from Gagnon, Duke submitted false statements on the loan application that $280,000 earnest money was given to the seller and that none of down payment was borrowed. The lenders, WAMU and National City Bank, approved the loans. National City Bank, who approved the second mortgage for $347,300, relied on the same false information Kurlemann and Duke provided to WAMU.

-5-

On July 25, 2007, the HUD-1 settlement statement showed that Kurlemann had received $280,000 earnest money. The statement on the HUD-1 settlement statement was false.

Kurlemann walked away from the closing with approximately $305,716 in loan proceeds from the fraudulent sale. Not surprisingly, the loans for both properties went into default. The Emerald Isle property sold at foreclosure for approximately $1,150,000; a loss of approximately $1,650,000. 8662 Hampton Bay is still in foreclosure.

## II. STANDARD OF REVIEW

Motions to dismiss indictments are governed by Rule 12 of the Federal Rules of Criminal Procedure which states that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." Fed. R. Crim. P. 12(b). The Sixth Circuit guides district courts to "dispose of all motions before trial if they are capable of determination without trial of the general issue." *U.S. v. Jones,* 542 F.2d 661, 665 (6th Cir. 1976). Moreover, "Rule 12 vests the Court with authority 'to determine issues of fact in such manner as the court deems appropriate.'" *Id.* (quoting Notes of the Advisory Committee to Fed. R. Crim. P. 12, reprinted in 8 Moore, Federal Practice 12.01(3) at 12-8 (2d ed. 1976)).

The Federal Rules of Criminal Procedure "clearly envision that a district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion so long as the court's findings on the motion do not invade the province

-6-

of the ultimate finder of fact." *Jones,* 542 F.2d at 664; *see also U.S. v. Craft,* 105 F.3d 1123, 1126 (6th Cir. 1997) ("District Courts may ordinarily make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate factfinder."). A defense raised in a motion to dismiss an indictment is "capable of determination if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Jones,* 542 F.2d at 664 (citing *United States v. Covington,* 395 U.S. 57, 60 (1969)).

On a motion to dismiss an indictment, "the [c]ourt must view the [i]ndictment's factual allegations as true, and must determine only whether the [i]ndictment is 'valid on its face.'" *U.S. v. Campbell,* No. 02-80863, 2006 U.S. Dist. LEXIS 16779, at *2 (E.D. Mich. Apr. 6, 2006) (citing *Costello v. United States,* 350 U.S. 359, 363 (1956)). Accordingly, the Court must resolve factual issues in this case, such as they exist, in favor of the indictment. With this standard in mind, the Court turns to an analysis of Defendant's motion.

## III. ANALYSIS

### A. Theory of the Case

Defendant argues that the Supreme Court has rejected the government's theory of the case – that there is a "common understanding" that a borrowed deposit is capable of influencing a buyer's lender in its actions upon an application for a loan. Defendant relies

-7-

on two Supreme Court cases in support of this argument.

In *Williams v. United States*, 458 U.S. 279 (1982), the government argued that "common understanding" was enough to convict a defendant of making a false statement in violation of § 1014. The government argued that a conviction for a violation of § 1014 should be affirmed because the drawer of a check drawn on insufficient funds made a false statement to the bank where the check was presented because "a drawer is generally understood to represent that he 'currently has funds on deposit sufficient to cover the face value of the check.'" The Supreme Court held that such a construction of § 1014 was not permissible. "[W]hen interpreting a criminal statute that does not reach the criminal conduct in question, we are reluctant to base an expansive reading on inferences drawn from subjective and variable understanding." *Id.* at 286.

However, unlike *Williams*, Mr. Kurlemann's alleged false statements were actual written statements in a purchase agreement, loan application, and HUD settlement agreement, as opposed to a check which the Supreme Court found was not a "statement." (*See infra* Section III.C). In *Williams*, the Court held that the defendant's act of depositing a check contained no implied representation concerning the state of the depositor's bank balance. Here, there is no similar implied representation.[2]

---

[2] *Williams* has been superseded by a statute placing check kiting within the scope of federal bank fraud. *United States v. Devoll*, 39 F.3d 575, 578 (5th Cir. 1994). The bank fraud statute, 18 U.S.C. § 1344, was enacted specifically to counteract *Williams* which made § 1014 unusable in check kiting cases. *United States v. Kucik*, 844 F.2d 493, 498-99 (7th Cir. 1988).

In *United States v. Waechter*, 771 F.2d 974 (6th Cir. 1985), the defendant had on a number of occasions submitted multiple bids for a single property being sold by HUD and did so in a manner that did not reveal that the defendant controlled all of the multiple bids on a particular house. The government argued that defendant's crime was "the false impression created by Waechter's concealment of his submission of multiple bids." *Id.* at 977. However, the court ruled that "[w]e [the Court] resolve this conflict in favor of Waechter because we construe section 1010 to require proof that the defendant made an assertion of fact to HUD, a statement that was subject to proof or disproof, and we find no evidence that his bidding method entailed making statements that violated section 1010." *Id.*

Accordingly, Defendant claims that Mr. Kurlemann created a "false impression" not a "false statement" when he signed the purchase contract and HUD-1 – a false impression that the deposit was not borrowed. In *Waechter*, the government alleged that the false statement to HUD was "the false impression created by [the defendant's] concealment of his submission of multiple bids for a single property as an undisclosed princip[al]." *Id.* at 977. The Sixth Circuit held that the defendant made no false statement because he neither expressly nor impliedly told HUD that he was not using agents to place bids on his behalf. In addition, no HUD policy or regulation prohibited the defendant from using shills, so the defendant could not be convicted for falsely implying that he was submitting bids in compliance with HUD rules. *Id.* at 978-80.

-9-

The instant case is entirely different. The government is not alleging that Kurlemann created a false impression that he received a down payment, rather, that he expressly stated in the purchase agreements that he received down payments. The statements on the loan applications regarding the down payments are clear factual assertions that are either true or false.

## B.    Sufficiency of the Pleadings

The superseding indictment claims that Kurlemann made false statements on the purchase agreements for the two properties when he stated that he received down payments from the buyers. The conspiracy included the subsequent use of Kurlemann's false statements by his co-conspirators on the loan applications and other loan documents. These false statements were also on the loans at settlement.

An indictment is sufficient if: (1) it contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and (2) enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly represented expressly, without any uncertainty or ambiguity, set forth all of the elements necessary to constitute the offense intended to be punished.'" *Id.* (internal quotations omitted); *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001).

-10-

The superseding indictment charges conspiracy to commit loan fraud, in violation of 18 U.S.C. § 371, which states in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, . . . , and one or more of such persons do an act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years or both.

Count Five tracks the language of the statute. (Doc. 25 at ¶¶ 39-40). It also describes the manner and means of the conspiracy and alleges overt acts. The false statements made during the conspiracy are alleged with specificity. (*Id.* at ¶¶ 47-49 and overt acts c, d, e, h, i, j, o, p, q).

The superseding indictment charges Kurlemann and Duke with two substantive counts of loan fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1014 and 2. 18 U.S.C. § 1014 states in pertinent part:

> Whoever knowingly makes a false statement . . . for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation . . . upon any application, . . ., purchase, purchase agreement, . . ., loan, . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Again, Counts Six and Seven clearly track the language of the statute which sets forth the elements of the offense. (Doc. 25 at ¶¶ 51, 53). Moreover, the charges allege the false statements with specificity. Accordingly, the superseding indictment is sufficient. *United States v. Hudson*, 491 F.3d 590, 593-94 (6th Cir. 2007) (reaffirming that an indictment

-11-

which tracks the language of the statute is generally sufficient as to the elements of the crime).

### B. False Statements

Kurlemann insists that the down payments were borrowed. This is a crucial fact in dispute. According to Kurlemann, because the down payments were borrowed, the alleged false statements are actually omissions or "false impressions" that revolve around whether or not Kurlemann was required to tell the lender that the down payments were borrowed. Defendant claims that Section 1014 does not criminalize concealment or omission of information not requested, creation of a false impression, failure to volunteer information, or anything except a knowing false assertion of a fact that can be proved or disproved. *Williams*, 458 U.S. 279; *Waechter*, 771 F.2d 974. The government claims that Kurlemann's alleged "borrowed deposit" theory is a charade designed to hide the fact that no down payments or deposits were made at all.

Defendant claims that Counts 5, 6, and 7 do not adequately charge the "statement" element of the § 1014 violation because they do not allege that Kurlemann "made an assertion of fact to [WAMU], a statement that was subject to proof or disproof." *Waechter*, 771 F.2d at 977.

The Government claims that Kurlemann made an affirmative false statement when he signed an addendum to a purchase contract falsely stating that he had received a $200,000.00 down payment from Webster for the purchase of 8662 Hampton Bay:

> Builder also accepts a payment of $229,000.00 to be applied
> as $200,000.00 down payment & $29,000.00 for personal
> property to meet qualifications for the loan as specified by the
> Lender, received by Builder as of 12/01/06.

(Doc. 25 at ¶ 49(c); Doc. 29-4). Defendant claims that this statement is not a clear

assertion of fact. Specifically, defense counsel takes issue with the words "accepts" and

"receives."[3]

The Court finds that the plain meaning of the statement is that Mr. Kurlemann

received a down payment of $200,000.00 from the buyer of 8662 Hampton Bay on

December 1, 2006. The Court does not struggle with this analysis and finds that the

statement is clear on its face.

Also pertaining to the sale of 8662 Hampton Bay were a loan application and

HUD-1 settlement statement which allegedly contain false statements:

> Duke submitted fraudulent information for Webster's loan
> application which contained multiple false statements, including
> that $200,000 earnest money were 'funds already down' to the
> seller. Because Kurlemann submitted the addendum stating that
> he received the down payment as of December 1, 2006, Duke also
> submitted that none of the earnest money was borrowed, which
> was also false.

(Doc. 29-5).

---

[3] Defense counsel submitted to the Court as an exhibit the dictionary definitions of the words
"accept" and "receive" and asked that the Court take judicial notice of the definitions as it
considered the language in the addendum. The Court considered these definitions when reading
the text of the addendum.

> The HUD-1 settlement statement indicated the seller, defendant
> Kurlemann received $200,000 earnest money or excess deposit.
> This statement on the loan was false. After the closing,
> Kurlemann's associate instructed Webster to sign a promissory
> note for $229,000. WAMU did not know about the promissory
> note even though all financial transactions related to the sale
> should have been disclosed on the HUD-1.

(Doc. 29-6, 29-8).

The Court has carefully reviewed each of these documents and finds that the

government has sufficiently alleged that Kurlemann made false statements on 8662

Hampton Bay loan documents. *See e.g., United States v. Wells*, 63 F.3d 745, 751-52 (8th

Cir. 1995) ("omissions may constitute a false statement where honest statements would

otherwise be made."); *United States v. Walker*, 871 F.2d 1298, 1309 (6th Cir. 1989) ("A

statement may be false when it contains a half truth or when it conceals a material fact.");

*United States v. Trice*, 823 F.2d 80, 86 (8th Cir. 1987) (a false statement for the purposes

of Section 1014 can include the failure to disclose material information needed to avoid

deception in connection with a loan transaction).

The Government alleges that Kurlemann made the following affirmative false

statement on the purchase contract for 8657 Emerald Isle:

> On February 1, 2007 Kurlemann signed an initial purchase
> agreement with Christopher Gagnon to sell the property for
> $2,800,000. On the purchase agreement Kurlemann states that "a
> deposit of $280,000.00 (the "Deposit") has been paid to Owner
> upon signing of this Contract[.]"

(Doc. 29-9 at ¶ 2).

-14-

> Duke then submitted false information for Gagnon's $2,080.000
> loan application.

(Doc. 29-10).

> On April 19, 2007, Kurlemann signed another purchase contract
> with Gagnon. Kurlemann again stated that "deposit of
> $280,000.00 (the "Deposit") has been paid to Owner upon signing
> of this Contract[.]"

(Doc. 29-11).

> On May 3, 2007, Kurlemann signed another purchase agreement
> stating that "deposit of $280,000.00 (the "Deposit") has been paid
> to Owner upon signing of this Contract." Attached to this contract
> was a copy of a cashier's check as proof of payment.

(Doc. 29-15; Doc. 29-14)

> Subsequently, Duke provided false information in two loan
> applications for Gagnon, one for $2,080,000 and one for $347,300.
> Because Kurlemann submitted a purchase agreement with the false
> statement that he had received a $280,000 down payment, Duke
> submitted false statements on the loan application that $280,0000
> earnest money was given to the seller and that none of the down
> payment was borrowed.

(29-16).

> On July 25, 2007, the HUD-1 settlement statement showed that
> Kurlemann had received $280,000 earnest money. "Earnest
> Money Retained by Seller: $280,000.00[.]"

(Doc. 29-17).

The Court has carefully reviewed each of these documents and finds that the government has properly alleged that Kurlemann made false statements on 8657 Emerald Isle loan documents.

Moreover, each purchase agreement at issue included the following provision:

> SOLE CONTRACT/BINDING EFFECT. The parties agree that this Contract constitutes their entire agreement and that no oral or implied agreement exists. Any amendments to this Contract shall be made in writing, signed by all parties and copies shall be attached to all copies of the original contract. This Contract shall be binding upon and inure the benefits of Owner and Purchaser and their respective heirs, personal representatives, successors and assigns.

This provision contradicts Kurlemann's assertion that he only gave a "false impression that the seller had not loaned the deposit to the buyer." (Doc. 29 at 2). Any secret side agreement for Kurlemann to loan the down payment or deposit to the buyers should have been disclosed on the purchase contract.

These false statements are alleged in the superseding indictment and are straightforward assertions of fact that can be proved or disproved. (Doc. 25 at ¶¶ 48, 49 and overt acts c, h, j, o). This determination is within the province of the jury.

**C.    The Bank's Reliance on the False Statement**

Defendant contends that he could not form the requisite intent to influence the bank because there is no "common understanding" that a borrowed deposit is capable of influencing a buyer's lender in its actions upon an application for a loan. Defendant

-16-

encourages the Court to take judicial notice of the fact that the failure of the buyer's lender in these sales, WAMU, is the largest bank failure in United States history, and that federal regulations of WAMU's regulator the Office of Thrift Supervision ("OTS"), which Congress has just disbanded, did not require WAMU to consider or be influenced by whether these buyers' deposits were borrowed.

However, the government contends that the bank did not have to be influenced by the false statement. Therefore, any "common understanding" about what will influence the bank is irrelevant. The relevant inquiry is what the defendant thought would influence the bank by making the false statement.

Pursuant to 18 U.S.C. § 1014, the government need not show that the false statement actually influenced the bank, and it is irrelevant whether the bank detected the false statement. *United States v. Spears*, 49 F. 3d 1136, 1141 (6th Cir. 1995) (affirming conviction of defendant who had "knowingly misrepresented down payment figures on retail installment credit applications" and holding that "the essence of the offense is not why the defendant made the false statements or whether the bank was actually influenced or defrauded; rather, the determinative factor is the *making* of the" . . . "false statement with the intent to influence the lender."). *See also United States v. Wells*, 519 U.S. 482 (1997) (abrogating materiality requirement); *United States v. Grant,* 211 Fed. Appx. 889, 892 (11th Cir. 2006) ("[W]e have never required that the bank be actually aware of the false statement that was made."); *United States v. Grissom,* 44 F.3d 1507, 1511 (10th Cir.

-17-

1995); *United States v. Bowman,* 783 F.2d 1192, 1199 (5th Cir. 1986). In fact, "[t]he

proof need not show that [the document containing the false statement] was submitted

directly to a covered institution." *United States v. Lentz,* 524 F.2d 69, 71 (5th Cir. 1975).

Section 1014 is satisfied where the defendant makes a false statement for the

purpose of influencing the action of a covered institution and has "a reasonable

expectation that the statement [will] reach the covered institution." *Id.* (sending

document containing false statement to agent did not insulate defendant from criminal

liability under § 1014 where the evidence showed defendant had reasonable expectation

that the statement would reach the bank). "We focus on the defendant's conduct – not

whether the bank was aware or unaware of that conduct." *Grant,* 211 Fed. Appx. at 893

(citing *United States v. Johnson,* 585 F.2d 119, 125 (5th Cir. 1978)). In fact, a defendant

"need not make the false statements directly to a bank to be convicted under the statute,

nor need the defendant know which particular institution was involved; it is enough that

he knew the false statements were to be presented to a bank." *United States v. Bellucci,*

995 F. 2d 157, 159 (9th Cir. 1993). Because the government need not show actual

reliance by the bank on the defendant's false statement, the district court may properly

exclude evidence showing an absence of reliance by the financial institution. *United*

*States v. Lane,* 323 F.3d 568, 583 (7th Cir. 2003). Therefore, whether or not the bank

asked Kurlemann if the down payments were borrowed is irrelevant.

-18-

### D. Constitutionality of 18 U.S.C. § 1014

Defendant claims that 18 U.S.C. § 1014 is unconstitutional for a number of reasons. However, the Sixth Circuit has held that § 1014 is "unambiguous and broad." *United States v. Wade*, 266 F.3d 574, 579 (6th Cir. 2001). This circuit concluded that Section 1014 "prohibits an individual from 'knowingly mak[ing] *any* false statement . . . for the purpose of influencing in *any* way the action of the . . . [covered institutions] . . . upon *any* application.'" *Id.* Therefore, the statute should be applied broadly. *Id.*

#### 1. Materiality

Defendant argues that the indictment accuses Defendant of "creating a false impression" that the deposit was not borrowed by failing to volunteer that the deposit was borrowed.[4] Defendant argues that materiality must be an element of a Section 1014 offense. Specifically, Defendant claims that after the Supreme Court's decision in *United States v. Wells*, 519 U.S. 482 (1997), the government is now required to prove beyond a reasonable doubt that the false statement was material to the action of the federally insured financial institution on the loan application. Therefore, Defendant asks this Court to find Section 1014 unconstitutional because it does not contain the element of materiality.

---

[4]   The Court disagrees.  As explained in Section III.C, the purchase agreements contain alleged false statements, not misrepresentations or false impressions.

The Supreme Court decided eight to one that materiality is not an element of the

offense for 18 U.S.C. § 1014. *Wells*, 519 at 490-99. The Supreme Court explained:

> The language makes a false statement . . . a crime only if the speaker
> knows the falsity of what he says and intends it to influence the
> institution. A statement made for the purpose of influencing a bank
> will not usually be about something a banker would regard as trivial,
> and it will be relatively rare that the Government will be able to
> prove that a false statement was . . . made with the subjective intent
> of influencing a decision unless it could first prove that the
> statement has the natural tendency to influence the decision.

*Id.* at 499 (quoting *Kungys v. United States*, 485 U.S. 759, 780-81 (1988)). The classic

definition of materiality is "having a natural tendency to influence, or being capable of

influencing the decision of the decision-making body to which it was addressed."

*Kungys*, 485 U.S. at 770. The requirement that the government prove that the defendant

made the false statement "for the purpose of influencing the action" is similar to a

"materiality" requirement. However, it is not an essential element of the offense.

In fact, the *Wells* court found "[n]or have the respondents come close to showing

that at common law the term 'false statement' acquired any implication of materiality that

came with it into § 1014." *Id.* at 483. Accordingly, there is nothing to suggest that

Section 1014 is unconstitutional because materiality is not an essential element.

## 2. *Unconstitutional as applied to this case*

Defendant argues that Section 1014 is unconstitutional as applied to the instant

case because it fails to give Mr. Kurlemann and other sellers of real property adequate

notice that they have a duty to volunteer information, not just a duty to refrain from making false statements. Defendant claims that Section 1014 is a trap for the unwary seller who can be convicted of a felony for failing to volunteer information that the buyer's lender never requests.

Specifically, Defendant claims that the superseding indictment is defective because the HUD-1 Settlement statement certification by the seller is unfairly ambiguous and fails to give Mr. Kurlemann and other sellers of real property adequate notice that they have a duty to tell the buyer's lender if the deposit was borrowed even if the lender does not ask.

Even if the HUD-1 settlement statement were ambiguous, and the Court does not imply that it is, the purchase agreements that Defendant signed were not ambiguous and contain alleged false statements that Defendant received down payments on two properties when he had not. The issue is not whether the deposit was borrowed – the issue is whether the deposit was ever received.

### 3. *The alleged false statements are literally true*

Next, Defendant claims that Section 1014 is unconstitutional as applied in the superseding indictment because the alleged false statements are literally true, and, therefore, by making those statements, Kurlemann cannot be guilty of a violation of Section 1014. Defendant states that on the HUD-1 in the Gagnon sale, Mr. Kurlemann only certified "to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction."

-21-

Accordingly, Defendant claims that the deposit amount on the HUD-1 form in the two sales is literally true. In order for the government to prove beyond a reasonable doubt that Kurlemann made a false statement about the deposits, the jury would have to draw an inference that Kurlemann's certification meant more than the plain language of the certification states.

Again, the Court need not address this argument. The government has presented numerous loan documents with alleged false statements. Even if the HUD-1 document were literally true, and the Court does not imply that it is, this fact alone would be insufficient to dismiss the indictment.

### 4. *Kurlemann's fiduciary or other legal duty*

Finally, Defendant argues that Section 1014 is unconstitutional as applied in the superseding indictment because it does not allege that Defendant had a fiduciary or other legal duty to the buyer's lender to volunteer the information that the deposit was borrowed despite the lender not asking for the information. Additionally, Defendant argues that the documents from WAMU's loan files show that the actions on the two loan application were taken based on: buyer's stated income, stated assets, and credit score, and on the ratio of the loan amount to the appraised value of the real property – and whether the buyer's deposit was borrowed was not a criterion reflected in the loan documents.

First, the indictment does not allege that Defendant had to volunteer information; it alleges that he was required to truthfully complete loan paperwork. The government

-22-

alleges numerous examples of false statements on such paperwork. Moreover, as explained in Section III.C., the fact that WAMU did not rely on the deposit is irrelevant to a finding that the government has sufficiently plead the elements of a 1014 claim.

### E.    Questions of Fact Are for the Jury to Decide

The facts of this case are clearly in dispute. Therefore, *United States v. Levin*, 973 F.2d 463 (6th Cir. 1992), and *United States v. Ali*, 557 F.3d 715 (6th Cir. 2009), are not controlling. In *Levin*, the prosecution conceded that there were no disputed facts. 973 F.2d at 466 (prosecutor stated to the judge that there was *"probably no dispute of the facts"*). Similarly, in *Ali*, the government stipulated to the main fact that was in dispute – that the defendant's attempted marriage was *void ab initio*. 557 F.3d at 718. There are a number of disputed facts in this case that must be resolved by the jury. In a case that distinguished *Levin*, where the prosecution did not similarly concede (or stipulate to) disputed facts, the court noted, *inter alia*, that "in *Levin* the prosecution readily acknowledged the absence of any dispute as to the operative facts of the defendants' arguments. . . . The government makes no such concession here." *United States v. Pergler*, No. 98 CR 469, 1998 WL 887113, at 1-2 (N.D. Ill. Dec. 7, 1998). In sum, "[t]he presence of fact issues precludes [the defendant] from invoking Rule 12(b)." *Id.*

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Defendant's motion to dismiss the false statement charges (Counts 5, 6, 7) (Doc. 29) is **DENIED**.

-23-

**IT IS SO ORDERED.**

Date: September 10, 2010

Timothy S. Black
United States District Judge